**Babu THAKOR and Minaxi Thakor, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. CV–S–1549–PMP (RJJ).**

United States District Court, D. Nevada.

July 8, 1999.

John R. Erickson, Mark Wilkey, Woods & Erickson, Henderson, NV, for plaintiffs.

Michael D. Shane, Assistant United States Attorney, Las Vegas, NV, for defendant.

## ORDER

PRO, District Judge.

Presently before the Court is the United States' Motion for Summary Judgment (# 10) filed on April 9, 1999. Plaintiffs Babu Thakor and Minaxi Thakor filed an Opposition (# 14) on May 10, 1999.

Also before the Court is Plaintiffs Babu Thakor and Minaxi Thakor's Motion for Summary Judgment (# 11) filed on April 9, 1999. Defendant United States filed an Opposition (# 13) on May 10, 1999. Also

on May 10, 1999, Plaintiffs Babu Thakor and Minaxi Thakor filed a Reply (# 14).

## I. Background

Plaintiffs Babu Thakor and Minaxi Thakor ("Thakors") were the owners of the A & K Market in North Las Vegas, Nevada. The Thakors became eligible to participate in the Food Stamp Program on October 2, 1991. The United States Department of Agriculture's Food and Nutrition Service ("FNS") later permanently disqualified the Thakors from participation in the Food Stamp Program because Minaxi Thakor had accepted cash in exchange for food stamps in violation of 7 C.F.R. § 278.2(a) (1999).[1] *See* 7 U.S.C.A. § 2021(a) (West 1988 & West Supp.1999). The FNS then assessed a civil penalty of $60,000 against the Thakors when they sold the A & K Market after being permanently disqualified from the Food Stamp Program. *See* 7 U.S.C.A. § 2021(e)(1). The Thakors currently seek judicial review of the administrative review decision sustaining the assessment of the civil penalty.

The United States established the Food Stamp Program in order to provide a more nutritious diet for its citizens. *See* 7 U.S.C.A. § 2011 (West 1988). Under the program, individuals can use food stamps issued by the Government to obtain certain food at qualified groceries, and the store owners can redeem the food stamps for face value from the Government. *See* 7 U.S.C.A. § 2013(a) (West 1988). In order to preserve the goals of the Food Stamp Program, the Government carefully monitors qualified stores and individuals to ensure that they are adhering to the Program's rules. A violation by a qualified store can result in permanent disqualification from the program. *See* 7 U.S.C.A. § 2021. It is a violation of the Program rules for a store to exchange the food stamps for cash. *See* 7 C.F.R. § 278.2(a) (1999).

Acting on information provided to the Nevada State Welfare Division from an anonymous source, special agents from the United States Department of Agriculture ("U.S.D.A."), Office of the Inspector General began an investigation of the food stamp practices at the A & K Market in September 1994. In six separate instances, between September 1994 and February 1995, undercover agents received a total of $3,840 in cash in exchange for $7,680 worth of food stamps from Minaxi Thakor.[2] After completing the investigation, the Office of the Inspector General forwarded a copy of the report to both the United States Attorney's Office in Las Vegas, NV and to the FNS.

The report resulted in two letters being sent to the Thakors. First, on May 26, 1996, Assistant United States Attorney ("AUSA"), Blaine T. Welsch, sent a letter to the Thakors informing them of the investigation and warning them that they were in violation of the False Claims Act. The False Claims Act imposes liability if a person knowing makes a false claim for payment to the Government. *See* 31 U.S.C.A. § 3729(a) (West Supp.1998). The liability can include a $5,000–$10,000 penalty plus three times the amount of damages to the Government for each violation. *See* 31 U.S.C.A. § 3729(a). The AUSA informed that Thakors that they faced liability of $53,040 to $83,040 under the False Claims Act. The letter also put forth the possibility of settlement.

On June 27, 1996, the Thakors received the second letter. This letter was from the FNS, and charged the Thakors with trafficking in food stamps in violation of 7

---

1. The FNS was previously known as the Food and Consumer Service, and the two terms will be used interchangeably in this Order.

2. The undercover agents made the following transactions with Minaxi Thakor:

| Date of Transaction | Amount of Food Stamps | Cash |
|---|---|---|
| 10/13/94 | $ 10 | $ 5 |
| 11/09/94 | $ 110 | $ 55 |
| 01/12/94 | $ 150 | $ 75 |
| 01/25/94 | $ 600 | $ 300 |
| 02/02/94 | $2,000 | $1,000 |
| 02/17/94 | $4,810 | $2,405 |

C.F.R. § 278.2(a).[3] The letter told the Thakors that the penalty for trafficking was permanent disqualification from the Food Stamp Program, unless they qualified for an alternative civil penalty of up to $20,000 for each violation.[4]

The Thakors responded to the letter from the AUSA and began settlement negotiations. During the negotiations, the Thakors tried to obtain a release from the Government of all civil claims under any statute arising from or related to the trafficking violations. Also, during the negotiations, both parties believed that the Thakors might have to sell some of the store's inventory to meet their obligations, but they ended up finding the money elsewhere.

On December 24, 1996, the Thakors signed the Settlement Agreement. The Agreement stated that it constituted the "full settlement and satisfaction of the claims for damages and penalties which the United States [had] against Thakor as set forth in paragraph two . . ., except as otherwise provided herein." (Settlement Agreement, ¶ 3.) Paragraph two listed the six trafficking violations, and the United States alleged that the Thakors had violated the False Claims Act. (Settlement Agreement, ¶ 2.) The Agreement also provided that it did not constitute a waiver of any criminal or administrative remedies that the United States might have had against the Thakors. (Settlement Agreement, ¶ 4(D).)

Although the Thakors responded to the letter from the AUSA, they never responded to the letter from the FNS. Consequently, on January 13, 1997, the FNS notified them that they had been permanently disqualified from the Food Stamp Program. The FNS warned the Thakors that, under 7 C.F.R. § 278.6(f)(2), they would be subject to a civil money penalty if they sold their business.

Notwithstanding the letter, the Thakors sold their business to Mr. Amer Ramo on March 24, 1997. The escrow instructions declared that Babu Thakor was transferring all the "property, materials, supplies, merchandise, equipment, or other inventory" of the A & K Market, along with the name, goodwill, tenant improvements and a covenant not to compete, in exchange for a total consideration of $30,000. The Thakors assert that the sale was prompted by the fact that their manager had been shot two times, in December 1996 and in January 1997.

When the FNS learned of the sale, it assessed the Thakors a civil money penalty of $60,000. The Thakors requested an administrative review of the decision, making five arguments. First, they argued that the civil money penalty was improper because the Settlement Agreement settled all civil claims for money and damages. Second, they argued that the Food Stamp Regulations were not violated because the Thakors never owned the A & K Market. Third, they claimed that the civil money penalty was improper because the Government knew through settlement negotiations that they intended to sell the store. Fourth, they contended that the penalty was incorrectly calculated, even if it was justified. Fifth, they argued that they were justified in selling the store given the shooting that had occurred there. On October 8, 1998, the administrative review officer upheld the penalty. The Thakors now seek judicial review of that decision.

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, to-

---

**3.** Trafficking is defined as "the buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food." 7 C.F.R. 271.2 (1999).

**4.** The alternative civil penalty is available if the firm has an effective program in place for preventing violations of the Food Stamp Program rules before the violation occurred. *See* 7 C.F.R. § 278.6(i) (1999).

gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes *See Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1050 (9th Cir.1995). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *See S.E.C. v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir.1982).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). The substantive law defines which facts are material. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact is more than some "metaphysical doubt" as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over outcome determinative facts under the applicable substantive law will preclude the entry of summary judgment. *See id.* If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 847 (9th Cir.1996). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *See Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir.1996).

The Supreme Court cases cited above establish that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

**III. Discussion**

■ The Ninth Circuit Court of Appeals requires district courts to apply a bifurcated standard of review of FNS decisions concerning violations of the Food Stamp Program. *See Wong v. United States*, 859 F.2d 129, 132 (9th Cir.1988). The district court reviews whether the store owner violated the Food Stamp Program de novo. *See id; see also* 7 U.S.C.A. 2023(a)(15) (West Supp.1999). The store owner must show by a preponderance of the evidence that the Program rules were not violated. *See Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir.1997). The district court reviews the penalty imposed by the FNS to determine if it is arbitrary and capricious. *See Wong*, 859 F.2d at 132.

In this case, the Thakors challenge both the FNS' decision that they violated the Food Stamp Program and the penalty imposed by the FNS. The Thakors claim that they did not violate the Program rules because the Settlement Agreement settled all penalties arising from violations. They also maintain that the FNS should have

assessed the penalty on the basis of one violation, rather than six violations. In addition, they argue that the penalty is contrary to the goals of the Program and is unfair. Finally, the Thakors claim they are entitled to reasonable attorney's fees and expenses under the Equal Access to Justice Act.

### A. Violation of Food Stamp Program Rules

7 U.S.C.A. § 2021(e)(1) provides that

in the event any retail food store or wholesale food concern that has been disqualified under subsection (a) of this section is sold or the ownership thereof is otherwise transferred to a purchaser or transferee, the person or persons who sell or otherwise transfer ownership of the retail food store or wholesale food concern shall be subjected to a civil money penalty.

The Thakors do not dispute that they sold the A & K Market after they were permanently disqualified from participation in the Food Stamp Program, but they argue that the Settlement Agreement made them immune from any civil penalty for that sale.[5]

According to the Thakors, paragraph two of the Settlement Agreement provides that the parties are settling all of the United States' claims for damages and penalties against the Thakors, except as otherwise provided. The Thakors maintain that the only exceptions noted are possible criminal or administrative remedies or possible claims under the tax laws. (Settlement Agreement ¶ 4(C)–(D).) The Thakors then reason that a civil money penalty under 7 U.S.C.A. § 2021 is not an administrative remedy, and therefore, the United States is precluded from seeking it. There are several problems with the Thakors' analysis of the Settlement Agreement, and these problems reveal that the Settlement Agreement does not prevent

the United States from enforcing the civil penalty.

First, the Thakors appear to be construing the term "remedies" more narrowly than might have been intended. The Thakors are interpreting remedies, as used in the Settlement Agreement, to mean damages seeking to compensate for injuries, as opposed to a penalty used as punishment. *See Barron's Law Dictionary* 73 (3rd ed.1991). However, the Settlement Agreement states that the Government does not waive either "criminal or administrative remedies." (Settlement Agreement ¶ 4(D).) The word "remedies" appears to refer to both the word "criminal" and the word "administrative." Since criminal remedies are primarily used for punishment, rather than compensation, the parties appear to have been using the word "remedies" in a general sense. In other words, the United States is not waiving any damages or penalties available under the possible criminal or administrative schemes.

■ Notwithstanding the above discussion, the Court will use the Thakors' interpretation for the purposes of this analysis. The Thakors' interpretation is reasonable given that remedies most often refers to compensatory type damages. Moreover, even if the Court uses the Thakors' interpretation of remedies, there are still problems with the Thakors' conclusion that the Settlement Agreement absolves them of liability.

Although paragraph three of the Settlement Agreement does state the Agreement constitutes settlement of all claims for damages and penalties against the Thakors, the remainder of the paragraph states that the Agreement settles all the claims as set forth in paragraph two. Paragraph two of the Agreement lists the six instances of food stamp trafficking and states that the United States alleges that

---

5. In their administrative appeal, the Thakors argued that they never owned the A & K Market, but instead, were lessees. They do not raise this argument in this request for judicial review.

the Thakors have violated the False Claims Act. Therefore, the statement that the Agreement settles the claims for damages and penalties only refers to the damages and penalties for violations of the False Claims Act. If the Agreement only settles the False Claims Act claims, then the United States can enforce the civil penalty for selling the A & K Market.

At most, the statement in paragraph three that the Agreement settles all claims for damages and penalties as set forth in paragraph two means that the Agreement settles all claims related to the six trafficking transactions listed in paragraph two. The United States would still be able to bring a criminal action and would still be able to permanently disqualify the Thakors from participating in the Food Stamp Program because the Agreement specifically stated that the United States was not waiving any rights to bring those claims. (Settlement Agreement ¶ 4(D).) Even if the Agreement settled all other claims related to the trafficking transactions, the Government would still be able to enforce the civil penalty at issue in this case. The civil penalty did not result from the Thakors trafficking in food stamps. Instead, it resulted from a separate violation of the Food Stamp Program rules when the Thakors sold the A & K Market.

No reasonable interpretation of the Settlement Agreement leads to the conclusion that the Thakors are exempt from the civil penalty for selling their store. Nevertheless, the Thakors maintain that parol evidence suggests that the parties intended to settle all penalties, including penalties resulting from the sale of the store.

First, the Thakors point to a letter from the ASUSA as evidence that the Government intended to settle "all civil claims arising from the six transactions set forth in the original demand letter." (Letter from Welsch to Erickson of 6/28/96.) The six transactions refer to the six trafficking transactions. The Thakors' position is that this letter supports a view that all possible civil claims under the Food Stamp Act, except those specifically exempted in the Agreement were settled. The Court, however, finds that this letter supports the conclusion that the Agreement only settled claims that resulted from the trafficking. The civil penalty at issue resulted from a different violation of the Program rules.

Second, the Thakors claim that the settlement negotiations demonstrate that both the Thakors and the Government contemplated the Thakors' sale of the A & K Market without penalty. A draft of the Settlement Agreement provided that the inventory and equipment of the A & K Market constituted collateral for the Thakors fulfillment of their obligations under the Agreement. (Letter from Erickson to Welsh of 7/12/96.) The United States agreed to release its security interest in the inventory and equipment in the event the Thakors sold the inventory or equipment for enough to satisfy their obligation under the Settlement Agreement. (Letter of Erickson to Welsh of 7/12/96.)

The negotiations reveal that the parties believed that the Thakors might have to sell some or all of the inventory and equipment to satisfy their debt. However, liquidating inventory is different from selling a business. The Thakors sold a going concern. The sale included the name of business, the goodwill of the business, and a covenant not to compete. (Escrow Instructions at 1.) The United States agreed to release its security interest if the Thakors sold the inventory, it did not agree not to assess any penalties if the Thakors sold their business.

The Thakors suggest that they were somehow tricked by the Government. The Thakors, however, were represented by counsel. Their attorney had access to the regulations requiring a penalty if the Thakors sold the A & K Market. The Thakors also received a letter warning them of the potential penalty before they completed the sale of the A & K Market. If the Thakors wanted to get out of the food selling business, they could have easily

contacted the FNS after receiving the letter to learn how to structure the liquidation of the business. Instead, they ignored the letter and proceeded with the sale. They cannot now complain that they were tricked into thinking that the sale was allowed.

The Settlement Agreement the Thakors reached with the United States at most related only to the six instances of food stamp trafficking. It did not provide immunity from any future violations of the Food Stamp Program rules. The Thakors violated the rules when they sold the A & K Market while they were permanently disqualified from the program.

### B. Penalty

7 U.S.C.A. § 2021(e)(1) provides that the penalty for transferring ownership of a store after disqualification shall be "established by the Secretary through regulations to reflect that portion of the disqualification period that has not yet expired." The statute also provides that in the case of permanent disqualification the penalty will be double the penalty for a ten year disqualification period. *See* 7 U.S.C.A. § 2021(e)(1). The regulation set out the following formula for calculating the penalty:

(1) Determine the firm's average monthly redemptions of coupons for the 12– month period ending with the month immediately preceding that month during which the firm was charged with violations.

(2) Multiply the average monthly redemption figure by 10 percent.

(3) Multiply the product arrived at in paragraph (g)(2) by the number of months for which the firm would have been disqualified under paragraph (e) of this section. The civil money penalty shall not exceed $10,000 for each violation.

7 C.F.R. § 278.6(g).

In calculating the penalty owed by the Thakors, the FNS began with the Thakors

average monthly redemptions on $5,124.17. (Wimer Declaration.) This led to an uncapped penalty of $122,880. (Wimer Declaration.) However, since the Thakors had engaged in six trafficking violations, the penalty was capped at $60,000 or $10,000 per violation.

The Thakors claim this penalty is arbitrary and capricious because it is calculated incorrectly, does not advance the legislative goals, and is unfair. The Supreme Court has stated that to decide whether an agency decision is arbitrary and capricious the court should consider whether

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n of United States, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoted with approval in *Vasudeva v. United States,* 3 F.Supp.2d 1138, 1143 (W.D.Wash.1998)).

### 1. FNS Calculated Penalty Incorrectly

The Thakors argue that the FNS calculated the penalty incorrectly because it based the amount of the penalty on the six underlying trafficking violations. The formula for calculating the penalty states that the penalty shall not exceed $10,000 per violation. *See* 7 C.F.R. § 278.6(g). The Thakors reason that there is only one violation here, the violation for selling the store. Therefore, the penalty should be capped at $10,000. The Thakors also maintain that the Government cannot base the penalty amount of the six trafficking violations because those violations were settled.

 The FNS is interpreting the word "violation" in the formula for calculating the penalty to mean the violations of the

Food Stamp Program rules that resulted in the Thakors' disqualification for the program. In contrast, the Thakors interpret "violation" to mean the violation that is causing the penalty, in this case the sale of the store. "In interpreting an administrative regulation, the administrative interpretation is given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Lesoeur v. United States*, 21 F.3d 965, 969 (9th Cir.1994) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).

■ The FNS' interpretation is not contrary to the purpose of the statute. The legislative history of 7 U.S.C.A. § 2021(e)(1) shows that Congress' purpose in creating the penalty was to deter Program abuses by stores. *See* S.Rep. No. 99–145 (1985); *see also* H.R.Rep No. 99–271(I) (1985). Before Congress passed the law requiring the penalty, store owners could get out of the disqualification period by selling their stores. *See* S.Rep. No. 99–145 (1985). Moreover, many of the sales were actually fictitious sales to friends or relatives. *See* S.Rep. No. 99–145 (1985). Under the Thakors' interpretation, the most the penalty would ever be for selling a disqualified store is $10,000. This amount is not likely to be a very efficient deterrent, especially for store owners that had frequently violated the Program rules and had reaped large profits. A penalty cap tied to the number of violations that led to disqualification is likely to be have a greater deterrent effect.

■ Furthermore, the Thakors' argument that the FNS cannot base the penalty on the six trafficking violations because they were settled is without merit. The penalty is not resulting from the previously settled violations, but is resulting from the sale of the store. The trafficking violations are only used in calculating the amount of the penalty.

**2. Penalty Does Not Advance Purpose of Statute**

■ The Thakors argue that the assessment of the penalty against them is arbitrary and capricious because it does not advance the purposes of the 7 U.S.C.A. § 2021(e)(1). As previously discussed, Congress enacted the statute providing for the penalty upon sale of a disqualified store to deter abuses such as selling the store to end a disqualification period and selling the store to friends and family. *See* S.Rep. No. 99–145 (1985); *see also* H.R.Rep No. 99–271(I) (1985). According to the Thakors, they were not intending to get out of the disqualification period. Instead, they sold the store because of repeated violence against their manager and a resulting fear for their lives. They also did not engage in a sham sale, but sold the store to an uninterested third party.

Although the congressional purpose was primarily to deter sales designed to get out of punishment for violating Food Stamp Program rules, Congress did not provide any exceptions for other sales in the statute. As the United States points out, when the language of a statute is unambiguous, courts generally do not examine the legislative history to determine the statute's meaning. *See Jenkins v. I.N.S.*, 108 F.3d 195, 200 (9th Cir.1997). The FNS followed the statute as written and cannot, therefore, be said to have acted arbitrarily and capriciously.

Even if the Court were to examine the legislative history, it is not clear that the FNS should have created an exception for the Thakors because their sale was not designed to thwart Program rules. It is true that Congress was concerned about sales used to end disqualification periods, but no where did Congress indicate that it intended exceptions for sales with more benign motives. In fact, the House of Representatives did discuss creating an exception in the statute where the buyer of a previously disqualified store would not be prohibited from accepting food stamps. *See* H.R.Rep. 99–271(I) (1985). Congress,

therefore, recognized that not all sales would be the kind of sales it was worried about, but still chose not to provide any exceptions.

### 3. Penalty Is Unfair

The Thakors' third argument is that the $60,000 penalty is unfair. It is too large given the amount of damage to the Government ($3,840) and the value of the store ($36,834.13). They urge the Court to apply the principle of fairness applied by the Eight Circuit Court of Appeals in *Corder v. United States*, 107 F.3d 595, 597–98 (8th Cir.1997).

In *Corder*, a store owner was charged with trafficking when an employee exchanged $305 in cash for $610 worth of food stamps. *Id.* at 596. The owner requested a civil money penalty in lieu of permanent disqualification. *Id.* The U.S.D.A. Food and Consumer Service granted the request and assessed the owner a $40,000 fine pursuant to 7 C.F.R. § 278.6(i). *Id.* The owner maintained that the formula used to calculate the fine was arbitrary and capricious, and the court agreed. *Id.*

The court noted that Congress had not specified the factors that the Food and Consumer Service should consider when assessing a penalty in lieu of disqualification, but instead had directed the agency to make the punishment fit the crime. *Id.* The Court determined that the mandate from Congress meant that the agency did not have unfettered discretion, but had to follow principles of fairness. *Id.* at 597–98. The court then followed fairness principles that Congress had articulated for other statutes administered by the U.S.D.A. *Id.* The principles require the agency to examine the gravity of the offense, the business size, and penalty's affect on the business when assessing a penalty. *Id.* The court found that, since the formula did not consider those factors, the penalty was arbitrary and capricious, at least as applied to the owner. *Id.*

This case, however, is different from *Corder*. Unlike the situation involving a penalty in lieu of disqualification, Congress did not state that the penalty should fit the crime. Instead, Congress stated that it wanted a deterrent effect. Also, Congress was aware of the formula that the agency intended to use to calculate the penalty for selling a disqualified store. *See* S.Rep. 99–145 (1985) (stating that the Secretary had announced that "the amount of the penalty would be calculated in a manner similar to that used for existing civil money penalties (in lieu of disqualifications)."). Congress did not state that it had any problem with the use of that formula.

Recently, the United States District Court for the Western District of Washington examined an issue similar to the issue currently before this Court and the issue in *Corder*. *See Vasudeva v. United States*, 3 F.Supp.2d 1138 (W.D.Wash.1998). Store owners complained that the method of basing the penalty in lieu of disqualification on average monthly profits from food stamps penalized more heavily stores in poor neighborhoods that had to accept a large number of food stamps. *Id.* at 1139.

 In addition to rejecting *Corder* as not applicable to the facts of the case, the court found that the use of a formula to determine the penalty was not an abuse of discretion. *Id.* at 1143–44. According to the court, an agency can exercise its discretion by selecting a formula. *Id.* at 1144. "An agency may decide to exclude certain factors from a formula because evaluating those factors accurately costs more than any benefit gained." *Id.* This court agrees. The penalty in this case was not arbitrary and capricious even though the FNS did not consider the amount of damage and the size of the business when computing the penalty.

The court in *Vasudeva* also noted that the formula was not arbitrary and capricious because the agency had considered the problem complained of by the owners when it promulgated the formula. *Id.* at 1143. One of the comments about the proposed rule was that it would be a dis-

proportionate hardship to stores in lower income neighborhoods. *Id.* Similarly, a comment about an earlier rendition of the rule at issue in this case was that it might be damaging for small businesses. 49 Fed.Reg. 22055, 22056 (1984).[6] Consequently, the FNS did consider the Thakors' argument, and the use of the formula is not arbitrary or capricious.

### IV. Conclusion

The Settlement Agreement between the United States and the Thakors settled any claim that the Thakors violated the False Claims Act by redeeming illegally obtained food stamps. At most, it settled all claims related to the six instances of food stamp trafficking. The Settlement Agreement did not settle claims for future violations of the Food Stamp Program rules. When the Thakors sold their disqualified store, they violated the rules and were subject to a penalty. While the penalty may be very large and may seem unfair given that the Thakors were not trying to get out of any disqualification period, it is in line with congressional intent and is neither arbitrary nor capricious. The Thakors' claim that they are entitled to attorneys fees and costs under the Equal Access to Justice Act must also fail because they are not the prevailing party. *See* 28 U.S.C.A. § 2112(b), (d)(1)(A).

IT IS THEREFORE ORDERED that the United States' Motion for Summary Judgment (# 10) is GRANTED and the decision of the administrative review officer is AFFIRMED.

IT IS FURTHER ORDERED that Babu Thakor and Minaxi Thakor's Motion for Summary Judgment (# 11) is DENIED.

---

6. When it published the proposed formula for calculating the penalty for transferring a disqualified store, the FNS stated that it intended to use to formula set out in § 278.6(g). 51 Fed.Reg. 43612, 43614 (1986). In an earlier rendition of § 278.6(g), the FNS proposed increasing the penalty and received a comment about possible harm to small businesses. 49 Fed.Reg. 22055, 22056, 22058 (1984).