**Sonja OBJIO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. Civ.A. 99–11239–WGY.**

United States District Court, D. Massachusetts.

Sept. 29, 2000.

Patricia M. Connolly, U.S. Atty's Office, Boston, MA, for Defendant.

Paul R. Keating, Shafner, Keating and Cuffe, Lynn, MA, for Plaintiff.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

The plaintiff Sonja Objio ("Objio") brought this suit under 7 U.S.C. § 2023(a)(13) of the Food Stamp Act (the "Act") and 7 C.F.R. § 279.10(a) (1999) of the Food Stamp Program Regulations[1] (the "Regulations") to appeal the decision of the United States Department of Agriculture, Food and Nutrition Service (the "Service"), which imposed upon her a civil money penalty of $36,760.19. Pursuant to 7 U.S.C. § 2021(e)(1) of the Act and 7 C.F.R. §§ 278.6(f)(2)–(4) (1999) of the Regulations,[2] this penalty was imposed because Objio had sold her store within a five-year period during which her store was disqualified from participating in the

---

1. Section 279.10(a) of the Regulations provides that "a firm aggrieved by the determination of the administrative review officer may obtain judicial review of the determination by filing a complaint against the United States in the U.S. district court for the district in which the owner resides or is engaged in business...." 7 C.F.R. § 279.10(a).

Section 2023(a)(13) of the Act similarly allows a store to appeal an administrative decision of the Service to a United States district court. See 7 U.S.C. § 2023(a)(13).

2. Section 278.6(f)(2) of the Regulations states that "[i]n the event any retail food store or

wholesale food concern which has been disqualified is sold or the ownership thereof is otherwise transferred to a purchaser or transferee, the person or other legal entity who sells or otherwise transfers ownership of the retail food store or wholesale food concern shall be subjected to and liable for a civil money penalty." 7 C.F.R. § 278.6(f)(2).

Section 2021(e)(1) of the Act similarly authorizes the Service to impose upon a store owner a civil money penalty for selling or transferring ownership of a store during this disqualification period. See U.S.C. § 202(e)(1); see also infra note 12.

Food Stamp Program. After an officer of the Administrative Review Branch of the Service affirmed the decision to impose the penalty, Objio filed an appeal with this Court to challenge the officer's affirmation.

Objio argues that the imposition of the penalty is both arbitrary and capricious for two reasons. First, Objio claims that the civil money penalty of $36,760.19 is grossly disproportionate to the amount of money involved in the Food Stamp Program violations. Second, claiming that her meager knowledge of the English language limited her understanding of the Regulations and her correspondence with the Service, Objio contends that the imposition of the penalty was unfair. In response, the Service filed a cross motion for an Order Affirming the Decision of the Administrative Review Officer.

## I. Procedural and Factual Background

The following facts may be gleaned from the administrative record. Before Objio sold her store, she was the owner of Merengue Market, a small grocery store located at 197 Essex Street in Lynn, Massachusetts. See Def.'s Mem. at 3.[3] Objio has an extremely limited grasp of the spoken English language and no comprehension of written English whatsoever. She is fluent Spanish. See Pl.'s Mem. at 2.

In November 1996, Objio filed an application to participate in the Service's Food Stamp Program. When she signed her application, she certified that she had reviewed and understood both the Food Stamp Program Regulations and the penalties for violating those regulations. Her application was subsequently approved.

Service Regulations prohibit the sale of non-food items for food stamps in participating stores. See 7 C.F.R. § 278.2(a) (1999).[4] After receiving an anonymous complaint that non-food items were being sold for food stamps in Objio's store, Rolando Amaya ("Amaya"), a Service representative, called Objio on May 20, 1997, to discuss the alleged violations. It is unclear from the record whether the conversation was conducted in English or Spanish. Objio denied the allegation. Amaya subsequently reviewed the Food Stamp Program Regulations with her and emphasized that violations could result in disqualification from the program. Amaya later sent a letter to Objio dated May 22, 1997, written entirely in English, to confirm the conversation and to reiterate the possibility of disqualification if further violations were discovered.

In October 1997, the Service commenced a two-month investigation of Objio's store, during which Pablo Rodriguez ("Rodriguez"), Objio's husband and an employee of the store, was found to have accepted food stamps for ineligible goods on seven separate occasions. Although the majority of these goods were common ineligible items[5] such as soap and laundry detergent, cigarettes (which if sold in large quantity would be considered major ineligible items)[6] were sold on four occasions. There is no information in the record as to whether the investigators spoke English or

---

3. Because there is no dispute about the facts in this case, most of the factual statements in this section are taken from the Defendant's Memorandum in Support of Motion for Order Affirming the Decision of the Secretary. As a result, citations to this memorandum are omitted. Factual information taken from other documents will be noted accordingly.

4. Section 278.2(a) of the Regulations states that "[c]oupons may be accepted ... only in exchange for eligible food.... Coupons may not be accepted in payment of interest on loans or for any other nonfood use." 7 C.F.R. § 278.2(a).

5. The Definitions Section of Chapter 10 of the *Summary of Service Handbook 318* defines common ineligible items as non-food items of "low cost such as cleaning products; paper products; other common household items"; small quantities of alcohol and tobacco. *Food and Nutritional Services Handbook* 10–4 (1992) ("*FNS Handbook*").

6. It is unclear from the record whether the quantity of cigarettes sold was so large as to constitute a major ineligible item. *See FNS Handbook* 10–4.

Spanish to Rodriguez on the first six visits. According to Objio, the investigator's report states that, during the last visit, Rodriguez made clear to the investigator that he did not speak English. *See* Pl.'s Mem. at 3. This particular investigator apparently did not speak Spanish because a customer was eventually asked to translate for the investigator and Rodriguez. *See id.*

After these investigations, the Service notified Objio in a letter dated March 2, 1998, that Merengue Market would be disqualified from the Food Stamp Program. In the letter she was encouraged to supply additional information and to respond to the allegations. Although the letter was written in English, the letter includes a paragraph in Spanish asking Objio to contact the Service for an explanation of the content of the letter if she did not understand it. On March 9, 1998, Objio appeared at the Boston Field Office of the Department of Agriculture to respond to the charges. She denied that her husband had sold ineligible items at her store, and she instead put the blame on an employee who had left the country when this meeting took place.

Objio's explanation failed to convince the Service, which subsequently notified Objio in a letter dated April 30, 1998, that her store would be disqualified from the Food Stamp Program for five years pursuant to 7 C.F.R. § 278.6(e)(2) (1999).[7] The letter also notified Objio that she would thereafter be subject to the provisions of 7 C.F.R. §§ 278.6(f)(2)–(4). These provisions mandate the imposition of a civil money penalty if a store is sold or if its ownership is otherwise transferred during the disqualification period. *See* 7 C.F.R. §§ 278.6(f)(2)–(4). Again, although the letter was written in English, it included the same paragraph in Spanish as did the letter dated March 2, 1998.

In a letter to the Administrative Branch of the Service, Objio's attorney, Pedro Saleme, requested a review of the disqualification decision. On June 17, 1998, Administrative Review Officer Samuel Bauer ("Bauer") sustained the Service's finding that violations had occurred and upheld the five-year disqualification ruling. The disqualification was to begin on July 23, 1998. In his letter informing Objio's attorney of the decision, Bauer warned Objio of the imposition of a hefty fine pursuant to 7 C.F.R. § 287.6(f)(2)–(4) should she sell her store or otherwise transfer its ownership to a third party during the disqualification period. It is important to note that by this time Objio was assisted by her attorney in her correspondence with Bauer and the Service. A separate letter explaining the ruling and the disqualification was sent by the Service to Objio herself on July 23, 1998. Once again, this letter included a paragraph in Spanish directing Objio to seek assistance from the Service if she did not understand the content of the letter.

On August 20, 1998, Objio sold the assets of her store, including the inventory, fixtures, and equipment, to Rogelio Duran. This transaction violated 7 C.F.R. § 278.6(f)(2)–(4), of which Objio should have been aware after repeated warnings from the Service and the Administrative Review Officer to both her and her lawyer. The Service proceeded to impose a civil money penalty of $36,760.19 on Objio, calculated in accordance with 7 C.F.R. § 278.6(g).[8] The Service informed Objio

---

7. Section 278.6(e)(2) of the Regulations states that a firm will be disqualified for five years: if it is to be the firm's first sanction, the firm had been previously advised of the possibility that violations were occurring and of possible consequences of violating the regulations, and the evidence shows that: (i) It is the firm's practice to sell expensive or conspicuous nonfood items, cartons of cigarettes, or alcoholic beverages, in exchange for food coupons.

7 C.F.R. § 278.6(e)(2).

8. Section 278.6(g) of the Regulations provides that the civil money penalty should be calculated as follows:

(1) Determine the firm's average monthly redemptions of coupons for the 12–month period ending with the month immediately preceding that month during which the firm was charged with violations; (2) Multiply the average monthly redemption figure

of the imposition of the penalty in a letter dated February 9, 1999.

Objio requested a second administrative review of the assessment of the penalty. Administrative Review Officer Richard Havenn determined that the penalty was appropriately assessed. He found that the penalty was calculated properly and that Objio had sold her store after having been notified in the April 30, 1998 letter that she was potentially subject to an extremely large fine after such sale. Objio then filed this action to challenge the penalty, arguing that the penalty was both arbitrary and capricious.

## II. Discussion

■■■ Objio asks the Court to review not the decision to disqualify her store but only the decision to impose the penalty on her. This Court has a very limited scope of review over the latter decision. The First Circuit has adopted a bifurcated standard of review in food stamp cases, applying a de novo standard to the determination of the violation and a limited administrative review standard to the sanction imposed. *See e.g., Broad St. Food Mkt., Inc. v. United States*, 720 F.2d 217, 220 (1st Cir.1983); *Collazo v. United States*, 668 F.2d 60, 65 (1st Cir.1981); *Kulkin v. Bergland*, 626 F.2d 181, 184 (1st Cir.1980). Specifically, the First Circuit has held that a district court can only overturn the decision of an administrative agency to impose a sanction if the district court finds the decision to be arbitrary and capricious. *See Broad St. Food Mkt.*, 720 F.2d at 220. This holding is in accordance with the fundamental principles proclaimed by the Supreme Court "that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy, the relation of the remedy to policy is

peculiarly a matter for administrative competence" and that "[the Service's] choice of sanction is not to be overturned unless [the reviewing court] might find it is 'unwarranted in law ... or without justification in fact.'" *Butz v. Glover Livestock Comm'n Co., Inc.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 91 L.Ed. 103 [1946]). Objio thus has to surmount a very high threshold in order to overturn Administrative Review Officer Havenn's decision.

### A. Was The Penalty Greatly Disproportionate to the Value of Ineligible Goods Sold?

The First Circuit has equated the "arbitrary and capricious" standard with the "unwarranted in law or without justification in fact" standard. *See Kulkin*, 626 F.2d at 184. The Supreme Court has held that when deciding whether an agency's regulation is arbitrary and capricious, the reviewing court should consider whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■■■ Here, the amount of the penalty was calculated in accordance with the complex mathematical formula found in 7 C.F.R. § 278.6(g). Objio argues, however, that a $36,760.19 penalty is arbitrary and capricious because it is greatly disproportionate to the value of the ineligible goods sold during the seven violations,[9] each of

---

by 10 percent; (3) Multiply the product arrived at in paragraph (g)(2) by the number of months for which the firm would have been disqualified under paragraph (e)

of this section. The civil money penalty may not exceed $10,000 for each violation. 7 C.F.R. § 278.6(g).

**9.** Objio argues that the penalty is disproportionate even when compared to the amount of

which amounted to less than forty dollars.[10] To frame Objio's argument in the language of the Supreme Court: the imposition of penalty was arbitrary and capricious because the Service entirely failed to consider an arguably important factor in assessing the penalty—the value of the ineligible goods sold during the violations.[11]

This argument fails when one considers the policy considerations behind Congress' decision to impose this penalty. A review of both 7 U.S.C. § 2021(e)(1),[12] which authorizes the imposition of the penalty, and its legislative history,[13] shows that Congress' primary concern was that store owners would seek to evade disqualification by selling the store or otherwise transferring its ownership to a third party. Before the 1985 amendments, disqualification would end when the store was sold. *See* S.Rep. No. 99–145, at 262 (1985) ("Senate Report"). The Senate Report discussed the problem of fictitious sales of stores, often to family or friends, to evade disqualification. *See id.* It also described the civil money penalty as "a deterrent to retail store abuses [meant to] curtail the avoidance of penalties currently available through the sale or transfer of disqualified

stores." *Id.* To enhance the deterrent effect of the penalty, the Senate Report suggested that disqualified store owners should be prohibited from participating in the Food Stamp Program at other retail locations during the disqualification period, and that new owners of the disqualified stores should be forbidden to accept food stamps until the previous owners pay the penalty.[14] *See id.* at 263.

There is ample evidence suggesting that the method of calculation adopted in 7 C.F.R. § 278.6(g) is in line with Congressional intentions. Both the Senate Report[15] and 7 U.S.C. § 2021(e)(1) state that the method of calculation should "reflect the portion of the disqualification period that has not expired," *see* 7 U.S.C. § 2021(e)(1); Senate Report, at 262, which the formula in 7 C.F.R. § 278.6(g) expressly takes into account. The Senate Report acknowledges the Secretary of Agriculture's intention at the time the Report was written to adopt the method of calculation in 7 C.F.R. § 278.6(g) for assessing civil money penalty. *See* S.Rep. No. 99–146, at 262. If the Senate had considered the penalty calculated by this method excessive, it would have raised its concerns in the report.

all the goods, both eligible and ineligible, sold during the seven violations. All parties agree, however, that the eligible goods ought not be counted because store owners are not to be penalized for the eligible goods sold alongside the ineligible goods. The penalty ought only reflect the value of the ineligible goods.

10. This Court is, however, unable to ascertain the value of the ineligible goods from the record. Objio only provides the Court with the value of all the goods (no more than $40) sold during each of the seven violations. Since the value of the ineligible goods must be less than $40 also, the Court will use this figure in the rest of this opinion.

11. There are two ways the Service could have acted arbitrarily: first, by failing entirely to consider Congressional intent when enacting its regulations, and second, by deviating from its own regulations and guidelines when assessing the penalty. *See Lawrence v. United States*, 693 F.2d 274, 276 (2d Cir.1982).

12. Section 2021(e)(1) contains similar language to that appearing in 7 C.F.R. § 278.6(f)(2). *See supra* note 2. Section 2021(e)(1) explicitly grants the Secretary of Agriculture the discretion to determine the amount of penalty, stating that the penalty should be "an amount established by the Secretary through regulations to reflect that portion of the disqualification period that has not yet expired." 7 U.S.C. § 2021(e)(1).

13. *See* S.Rep. No. 99–145 (1985) ("Senate Report"); *see also* H.R.Rep. No. 99–271, pt. 1 (1985).

14. These measures were eventually adopted in 7 C.F.R. § 278.6(g).

15. The Senate Report states that "[t]he amount of the civil money penalty would be established by the Secretary and would reflect that portion of the disqualification period that has not expired." S.Rep. No. 99–147, at 262 (1985).

Nowhere in the Senate Report is it suggested that the penalty be made to reflect the amount involved in the violation. As the amount involved in the sale of ineligible goods is often small, a civil money penalty which is made proportionate to that amount is unlikely to have the kind of deterrent effect that the Senate intended. *See Thakor v. United States,* 55 F.Supp.2d 1103, 1111 (D.Nev.1999). The instant case illustrates this scenario. No more than $40 worth of goods were sold during each of the seven violations, giving rise to an aggregate of no more than $280 for all the violations. Meanwhile, Objio's store was sold for $15,000. A penalty proportionate to the $280 involved would fail to deter Objio from evading disqualification by selling her store. She would have had sufficient money to cover the penalty and still have made a profit from the sale of her store. Therefore, by adopting the method of calculation in 7 C.F.R. § 278.6(g) and not considering the value of the ineligible goods sold in that the calculation, the Service is merely following Congressional intent. It did not act arbitrarily or capriciously.

Indeed, the Service would have acted arbitrarily and capriciously had it deviated from its established regulations when imposing and assessing the penalty. The decision to impose a penalty and the calculation of that penalty here, however, were made in strict adherence to the Food Stamp Regulations. Objio sold her store after she had been notified of her disqualification from the Food Stamps Program, thus violating 7 C.F.R. § 278.6(f)(2). That section provides that a civil money penalty be imposed if a disqualified store is sold. The amount of the penalty is calculated in accordance with the method adopted in 7 C.F.R. § 278.6(g). Since the Service followed its "own regulations and guidelines

in imposing a sanction, the sanction is not arbitrary and capricious." *Lawrence* 693 F.2d at 276; *see also Thakor* 55 F.Supp.2d at 1111.

### B. Was the Penalty Unfair Due to Objio's Difficulty with English?

Objio argues that the imposition of the penalty is unfair [16] because she does not comprehend written English, and all the letters sent to her by the Service and the administrative review officers are written in English. She claims that the Service was or should have been aware of her language difficulty. While Objio provides no evidence to show that the Service was aware of her difficulty, the inclusion of a paragraph in Spanish in almost all of the Service's correspondence with Objio compels the inference that the Service was aware of the potential for such difficulty. The important question, however, is not the Service's awareness of the potential difficulty, but whether Objio was in fact disadvantaged by such difficulty during her communication with the Service to the extent that she did not comprehend the actions that were taken against her.

Objio refers to a few instances in which she claims that she was disadvantaged because of her difficulty with English. Since she is only appealing the decision to impose the penalty and not the decision to disqualify her from the Food Stamp Program, this Court only needs to consider her communication with the Service and Administrative Review Officer Havenn after she had sold her store. Objio retained a lawyer soon after she had been notified about the disqualification decision in a letter dated April 30, 1998. By May 5, 1998, the attorney who represented her had requested an administrative review on her behalf.[17] Therefore, although it is unclear

---

**16.** Of course, even if this Court decided that the penalty was unfairly imposed, it still could not overrule the administrative review decision unless it found the decision arbitrary and capricious, which it does not. *See Broad St.*

*Food Mkt.,* 720 F.2d at 220; *see also Kulkin* 626 F.2d at 184.

**17.** Attorney Pedro Saleme requested an administrative review on her behalf in a letter dated May 5, 1998. Thereafter, her corre-

from the record whether Objio was represented by a lawyer when she learned about the penalty on February 9, 1999, she had earlier retained a lawyer concerning the disqualification decision and should have known that she should seek legal assistance when she received another letter from the Service. As it turned out, of course, she did contact an attorney soon after receiving the letter.

By the time Objio appealed the penalty decision, she was represented by Attorney Paul Keating ("Keating"). Keating informed the administrative review officer of his representation of Objio in the review process and presented evidence on her behalf. When the review was complete, the administrative review officer notified Keating of his determination. Therefore, Objio was not disadvantaged in the review process because of her inability to comprehend written English. The argument that the penalty was unfairly imposed upon her because of her language difficulty is hence untenable.

III.   Conclusion

Based on the foregoing, Objio's Motion for Order Reversing the Decision of the Administrative Review office is DENIED [docket no. 8]. The Service did not act arbitrarily and capriciously in assessing a civil money penalty on her for selling her store during the disqualification period. The administrative review officer correctly affirmed the decision of the Service.

spondence with the administrative review officer was handled by Saleme until July 13, 1998, at the earliest. It is unclear from the

record at what time Saleme ceased his representation of Objio.