**STATE of Rhode Island, Office of the Secretary of State,**

v.

**RHODE ISLAND STATE LABOR RELATIONS BOARD et al.**

No. 95–457–M.P.

Supreme Court of Rhode Island.

May 20, 1997.

Katherine Merolla, Providence, for Plaintiff.

Thomas S. Hogan, Kingstown, Donald S. Iannazzi, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

The petitioner, State of Rhode Island, Office of the Secretary of State (the secretary), has asked us to review a Superior Court judgment upholding a decision of the respondent Rhode Island State Labor Relations Board (the labor board) that was adverse to the secretary. In its decision the labor board found that in early 1993 the secretary had discharged one of its employees because of her union-organizing activities.[1] As a result it awarded reinstatement and back pay to the employee, a former computer-systems analyst named Darcy Viner (Viner). Viner lost her job on January 5, 1993, when Barbara Leonard (Leonard), the newly elected Secretary of State, eliminated several positions in the secretary's office, including Viner's, pursuant to a reorganization plan recommended by Leonard's transition team of advisors. Consequently Viner and the other affected employees were all terminated from their employment with the secretary. However, in response to a complaint filed by the union, the labor board found that the secretary had discharged Viner because of the union-organizing activities she undertook between Leonard's November 6, 1992 election and her January 5, 1993 termination.

The secretary contends that there is absolutely no evidence in the record from which the labor board could have reasonably concluded that union organizing was the basis for Viner's discharge. The secretary also argues that in so ruling, the labor board effectively allowed Viner, an unclassified, at-will employee, to immunize her state job from reorganization by engaging in union-organizing activities during the interregnum following the election defeat of Viner's superior, former Secretary of State Kathleen Connell (Connell), and the inauguration of Leonard as the new Secretary of State.[2]

On this administrative record, we conclude that the Superior Court's judgment affirming the labor board's ruling must be reversed. We do so because we can discern no competent evidence to support the labor board's finding that Viner was discharged because of her union-organizing activities. Therefore, for the reasons detailed in this opinion, we grant the petition for certiorari filed by the secretary and quash the Superior Court's judgment upholding the labor board's decision.

### Travel

After Viner's January 5, 1993 termination from her job as a computer-systems analyst for the secretary, the union filed a complaint with the labor board, claiming that she had been terminated because of her union-organizing activities following the incumbent Secretary of State Connell's defeat in the November 1992 election and Leonard's January 5, 1993 inauguration. After hearing from three witnesses, the labor board determined that Viner had been discharged because of an anti-union animus exhibited by the new administration. Consequently it directed the secretary to reinstate Viner in her old job with back pay and without deducting any moneys Viner may have earned while working for different employers at any of her other post-termination jobs. The secretary appealed this decision to the Superior Court,

---

1. The Rhode Island Laborers' District Council, on behalf of Local Union 1033 of the Laborers' International Union of North America, AFL–CIO (the union), is a corespondent.

2. The present Secretary of State, James Langevin, defeated Leonard in the 1994 general election.

which, after finding it was based on competent evidence, upheld the labor board's ruling. Thereafter, the secretary filed a petition for a writ of certiorari with this court. We issued the writ to review the administrative record and the Superior Court's judgment in this matter.

### Facts

The administrative record reveals that following Barbara Leonard's 1992 election as Secretary of State for Rhode Island, she and her transition team of advisors decided to reorganize the secretary's operations and personnel. Between her November 2, 1992 election and her January 5, 1993 inauguration, Leonard received recommendations from her transition team and approved of various proposed organizational and cost-saving changes in the secretary's office, including the elimination of several positions. Pursuant to this reorganization, on January 5, 1993 (Leonard's first day in office), these positions were eliminated and the employees holding these jobs received notice of their discharge. Viner was one of these discharged employees whose position had been eliminated. She and her husband had both worked in the secretary's office under Leonard's predecessor, Connell.

After Leonard defeated Connell in the November 1992 general election, Viner began to organize and to advocate the benefits of unionization to the other employees in the Secretary of State's office. On January 5, 1993, the very day Leonard was sworn in, Edward Cotugno (Cotugno), a member of Leonard's transition team and the secretary's new director of administration, informed Viner that her job was one of several that the secretary had decided to eliminate as part of a reorganization to cut costs and to upgrade the office's effectiveness and efficiency. Pursuant to this reorganization, Cotugno personally delivered to Viner a letter terminating her from her job. The other employees in the office whose jobs had been eliminated as

part of the reorganization were also terminated on that date.

██ In her testimony before the labor board, Viner admitted that she did not become an active union organizer until after her former boss had lost her bid for reelection in November of 1992. In an effort to get a union up and running during the period between the election and Leonard's inauguration, Viner testified, she often made calls and distributed brochures to her coworkers during her lunch breaks. Although she also testified that she had worked as a computer-systems analyst with the secretary for five years without drawing a single complaint about her work,[3] Viner offered no evidence to the labor board concerning whether Leonard, Cotugno, or anyone else on Leonard's transition team knew about her union-organizing activity before she was discharged, much less did she prove that they had in fact discharged her because of such activity.

Cotugno told the labor board that Leonard had assembled a transition team to assess the office's operations and to devise a plan to get more bang out of the secretary's budgetary buck. In due course the team identified a number of areas they believed required correction or improvement through reorganization. One office operation they focused on involved the day-to-day workings of the computer department. An outside computer vendor advised the transition team that it could improve the office's computer capabilities and performance at a substantial savings to the state. Sometime during the two-month period between election day and January 5, 1993, the transition team recommended, and Leonard approved, a reorganization plan that would eliminate several positions in the office (including Viner's job) immediately upon Leonard's taking office.

Cotugno conceded that after the election he had seen some newspaper articles discussing an ongoing drive to unionize by employees in the secretary's office. But he stressed that he did not learn about Viner's union

---

**3.** The labor board relied heavily upon its finding that Viner had a spotless work record. However, such a fact is irrelevant in the context of a job reorganization like this one. *E.g., Landry v. Farmer*, 564 F.Supp. 598, 606 (D.R.I.1983) (up-

holding a previous reorganization implemented by a former Secretary of State notwithstanding that the employees whose jobs had been eliminated "were acceptable * * * in the jobs they were performing").

involvement until *after* she had been terminated on January 5, 1993:

"Q. After January 5, 1993, did you become aware of * * * Viner's activities with the Union relative to the Union Organizing Campaign at the Office of the Secretary of State?

"A. I don't quite understand the question.

"Q. Did you become aware of the fact that [Viner] was an active member of the Union Organizing Campaign Committee at the Office of the Secretary of State?

"A. First of all, I had no knowledge and clue of who wanted to be in the Union. As far as who was an organizer or who wanted to be a member, I'm not sure who was what. The only time I noticed that * * * Viner was still involved with the Union activity was when they were picking a supervisor for the Union election and she was picked, that would ring a bell to me to the effect that she was terminated and now all of a sudden she becomes a supervisor for the Union. So other than that, no; I had no clue, and that was after the termination already took place."

Cotugno insisted that the transition team never discussed any union-organizing efforts by any of the office's employees, and he could not speak for what other transition-team members knew or did not know about this subject, nor could he say what Leonard may have known or thought about it.

Robert Donely (Donely), chief of staff in the outgoing Connell administration, testified for Viner. Donely stated that he had met with representatives of Leonard's transition team several times before Connell left office. It is significant that he said nothing about any mention of union organizing during these preinauguration meetings with Leonard's transition-team members. However, he did recall an impromptu tête-à-tête he had in January 1993 with Cotugno sometime *after* Leonard took office and *after* Viner's January 5, 1993 discharge. At the time of the meeting Donely was angry because he believed the new secretary's office staff had been opening his personal mail. In fact Donely eventually instituted litigation involving the secretary concerning his attempt to obtain unemployment compensation following his own termination from employment. According to Donely, Cotugno boasted to him during this January meeting that the union was "going down" in the upcoming January 15, 1993 union election and that he "had the votes" to make it happen. (Cotugno categorically denied saying these things.) But Donely offered no evidence to the labor board concerning whether Cotugno even knew about Viner's involvement in any union-organizing activities during the critical pre-January 5, 1993 period when the transition team made its job-elimination decisions and communicated its recommendations to Leonard for her approval, much less did he provide the labor board with any evidence from which it could reasonably infer that Viner had been dismissed from her job *because* of any anti-union animus harbored by Cotugno, by Leonard, or by any other transition-team member.

Nonetheless this is exactly what the labor board determined. Believing that Cotugno had testified "close to the vest," the labor board discounted his testimony because it contained "numerous inconsistencies and outright contradictions." The labor board said that the words Donely attributed to Cotugno during their post January 5, 1993 meeting (that the union was "going down" in the upcoming election and that he "had the votes") proved that Cotugno was no friend of the union. And Cotugno's statement that as the January 15 union election approached, he had "noticed" that Viner "was *still* involved" with the union caused the labor board to conclude that he therefore must have known about her union-organizing activity *before* she was dismissed on January 5, 1993. Using these findings as a springboard to draw still further unwarranted inferences, the labor board then concluded (and this was its whole treatment of the subject) that it was not "credible of belief" that Cotugno had failed to tell Leonard and the transition team about Viner's union-organizing activity in connection with the secretary's pre-January 5, 1993 decision to eliminate her job and terminate Viner from employment and that, therefore, this must have been the real reason for Viner's discharge. To justify its findings on this score, the labor board pointed to evi-

dence that Leonard's administration eventually hired back more personnel (albeit in different positions) than had held the several jobs that had been eliminated in the reorganization. Thus, in regard to Viner's job elimination and discharge, the labor board concluded it was pretextual and in reality the product of anti-union animus. Accordingly it ordered the secretary to reinstate Viner and to give her back pay without any setoff for moneys that Viner may have received as unemployment compensation or earned in other jobs after she had been terminated from her government position.[4]

The secretary took exception to the labor board's decision and appealed to the Superior Court. After the court entered a judgment affirming the labor board's actions, this certiorari proceeding followed.

## Analysis

It is by now well settled that our task on certiorari is to determine whether there is *any* legally competent evidence to justify the Superior Court's affirmance of the labor board's decision. *See, e.g., Environmental Scientific Corp. v. Durfee,* 621 A.2d 200, 208 (R.I.1993) (adding that legally competent evidence is marked "by the presence of 'some' or 'any' evidence supporting the agency's findings"). Although our standard in reviewing an agency's factual findings is unquestionably narrow, *see Correia v. Norberg,* 120 R.I. 793, 799, 391 A.2d 94, 97 (1978), we would be abdicating our responsibility if we merely rubberstamped the Superior Court's judgment. On the contrary, if we find that there is "no reliable, probative, and substantial evidence on the whole record to sustain the board's findings," we are obliged to reverse a Superior Court judgment that upholds such findings. *See Barrington School Committee v. Rhode Island State Labor Relations Board,* 608 A.2d 1126, 1138 (R.I.1992); *see also Rhode Island Public Telecommunications Authority v. Rhode Is-*

*land State Labor Relations Board,* 650 A.2d 479, 485 (R.I.1994).

We do not question the labor board's right to disbelieve witnesses and to draw logical inferences from credible testimony. *See, e.g., Prospecting Unlimited, Inc. v. Norberg,* 119 R.I. 116, 123, 376 A.2d 702, 706 (1977). But the labor board cannot use its unquestionable power to assess the credibility of witnesses to posit factual findings unsupported by *any* evidence other than its disbelief of one or more witnesses. *See, e.g., National Labor Relations Board v. Oklahoma Fixture Co.,* 79 F.3d 1030, 1034 (10th Cir.1996); *see also National Labor Relations Board v. Eastern Smelting & Refining Corp.,* 598 F.2d 666, 670 (1st Cir.1979) (noting that "[s]uspicions arising from the fact that a union supporter was fired in itself are not enough" to indicate unlawful anti-union animus). Administrative fiat and surmise cannot alone sustain an agency's factual findings. *See National Labor Relations Board v. Special Mine Services, Inc.,* 11 F.3d 88, 90 (7th Cir.1993).

Laying out the inferential chain on which the labor board premised its findings exposes the missing links in its reasoning. From the words Donely ascribed to Cotugno in regard to the union's projected defeat in the upcoming election, the labor board found that not only Cotugno but all those others responsible for Viner's discharge must have shared an anti-union animus. They therefore inferred that if Cotugno felt this way about the union election after Viner's position had been eliminated, he and all the other decision makers working with Leonard must have been acting pursuant to an anti-union motive in eliminating Viner's position when Leonard took office. But on this record such an inference requires too great a leap across a yawning factual chasm.

Moreover, employers and their representatives have been allowed to express their opposition to a union as long as their state-

4. The labor board's refusal to deduct these other earnings from its backpay award to Viner also constituted legal error, *see, e.g., Zuromski v. Providence School Committee,* 520 A.2d 137, 138–39 (R.I.1987) (unemployment compensation); *Bryson v. Clark,* 89 R.I. 183, 186, 151 A.2d 688, 689 (1959) ("any money [plaintiff] received while actually working in private employment or in public employment regardless of its nature was to be deducted from his claim" for back pay), and is further evidence of the erroneous exercise of its authority in this case.

ments do not contain a threat of retaliation or a promise of benefit. *See generally Holo–Krome Co. v. National Labor Relations Board,* 907 F.2d 1343, 1345 (2d Cir.1990) (discussing employers' use of the First Amendment as a shield in unfair-labor-practice cases); *Eastern Smelting & Refining Corp.,* 598 F.2d at 670 (noting that protected speech should not be used to build unfair-labor-practice cases against employers). Here, the labor board's reliance on Cotugno's noncoercive predictions about the results of the upcoming union election to support its finding of an unlawful anti-union animus by the secretary raises free speech concerns about Cotugno's ability to express such views and opinions openly and fairly.

But even were we to assume that Cotugno's alleged "going down" remarks fell outside any zone of protected speech, the labor board's suggested inferences of anti-union animus as the reason for Viner's earlier discharge are still fraught with evidentiary problems. First, Cotugno's statements constitute a mere prediction (later proven accurate) concerning what would happen in the upcoming union election and do not necessarily indicate that he was biased against this union, much less unions generally. Second, Cotugno made these statements sometime *after* Viner's January 5, 1993 discharge when a union election was about to occur. Consequently they form a shaky foundation on which to build a finding that he therefore must have been anti-union *before* Viner's dismissal when the transition team decided to recommend the elimination of various positions. And even if we were to accept this inference as reasonable, the record scarcely supports the labor board's further inferences that the other members of the transition team shared Cotugno's alleged anti-union animus, that they and/or Cotugno knew about Viner's union involvement when they made the decision to eliminate her job, and that Leonard would not have approved the elimination of Viner's position and her discharge "but for" an anti-union animus possessed by one or more of them. *See National Labor Relations Board v. Crafts Precision Industries, Inc.,* 16 F.3d 24, 27 (1st Cir.1994); *see also National Labor Relations Board v. Wright Line, a Division of Wright Line,*

*Inc.,* 662 F.2d 899, 906 (1st Cir.1981) (noting that if a dismissal would have occurred regardless of the "anti-union motive, no unfair labor practice took place"), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

The labor board tried to shore up its basis for drawing these inferences by pointing to Cotugno's post-January 5 statement that he had "noticed" Viner "was *still* involved" with the union and by claiming that this fact proved he had an improper motive for eliminating her position as part of the reorganization. Again, there is less here than met the labor board's eye. Cotugno's testimony, fairly read, makes plain that when he made this statement, he was discussing Viner's selection as a union election official notwithstanding her earlier termination from employment with the secretary on January 5, 1993. Thus, this statement reveals nothing about what Cotugno may have known about Viner's union involvement before her January 5 discharge when the transition team recommended and Leonard approved the elimination of the position. *Cf. Papineau v. Personnel Board of Central Falls,* 101 R.I. 359, 362, 223 A.2d 549, 551 (1966) (in quashing the personnel board's decision, the court commented that "an inferred fact could have no probative force on the ultimate issue in a case if the evidentiary hypothesis upon which it was premised was susceptible to a more natural and probable inference"). And of course this statement by Cotugno provides no support whatsoever for the labor board's additional inference that Leonard and her transition team must also have been motivated by an anti-union animus that previously caused them to eliminate Viner's position as part of the reorganization they had already implemented. These inferences are simply too remote and the inferential chain too attenuated to hold the secretary to this unfair-labor-practice charge, even if, constitutionally, such noncoercive statements by an employer's representative could be relied upon to substantiate an anti-union motivation for the secretary's elimination of Viner's position.

■ Finally, the labor board was not entitled to conclude that the secretary's reasons

for including Viner as part of the reorganization were pretextual merely because the cost savings attributable to this decision (exchanging Viner's $42,000 salary for the $8,800 outside vendor's contract) were later eclipsed by the secretary's eventual hiring of additional employees for other positions. As a newly elected general officer, Leonard, working with her transition team of advisors, was entitled to eliminate various jobs, to create new ones, and to reallocate any savings realized from such a reorganization to objectives, policies, and operations that she and they believed would better serve the office's overall effectiveness.

Although we cannot and will not substitute our judgment for that of an administrative agency like the labor board when its factual findings are based on competent evidence in the record even when we disagree with the agency's conclusions, we shall also not allow ourselves to be reduced to the judicial equivalent of a potted plant when, as here, an agency attempts to pass off factually unsupported and legally impermissible inferences in the name of credibility determinations and administrative factfinding. Indeed, to do so would be to abdicate our judicial-review function.

## Conclusion

Discerning no legally competent evidence undergirding the Superior Court's affirmance of the labor board's findings, we grant the petition for certiorari and quash the judgment of the Superior Court. The papers in this case may be returned to the Superior Court with our decision endorsed thereon so that an amended judgment consistent with this opinion can be entered in favor of the secretary.