DECISION
This matter is before this Court on Petitioner William Del Santo's ("Del Santo") appeal from the Law Enforcement Officer's Bill of Rights Hearing Committee's ("Committee") August 16, 2005 decision, sustaining the six charges the Town of Bristol Police Department had brought against Del Santo for violating the Department's Rules and Regulations ("Rules and Regulations"). The Committee held that as a result of his misconduct, Del Santo should be terminated from his employment with the Department. Jurisdiction is pursuant to G.L. 1956 § 42-28.6-12. For the reasons set forth below, the Committee's decision is hereby affirmed.
 Facts and Travel
This controversy began in or around June, 2002 when Del Santo, a seventeen and one-half year veteran of the Bristol Police Department, first began to have a sexual relationship with Lisa Zimmerman ("Zimmerman"), a single mother of three. At the time, Del Santo was assigned as a D.A.R.E. officer and had met Zimmerman through Zimmerman's son, a student in the D.A.R.E. program. (Tr. V.I at 28.) At the onset of his relationship with Zimmerman, Del Santo would periodically go to Zimmerman's apartment and help her with her children who were having behavioral problems. (Tr. V.I at 28.) Thereafter, though, in June of 2002, their relationship became sexual. Id. at 30.
Zimmerman testified that Del Santo first attempted to progress their then-existing platonic relationship into a sexual relationship on June 20, 2002, when, while on-duty as a D.A.R.E. officer, Del Santo made a comment to Zimmerman implying his desire to have sex with her. Id. at 53.[1] Despite having rejected his advances at that time, Zimmerman stated that the relationship soon became sexual and that Del Santo would come to her home to engage in sexual relations about three times a month, for a period of nine months, while working the third shift. Id.
at 30. During the summer, Del Santo would visit Zimmerman between the hours of 12:00 and 1:00 and engage in sexual activity, yet he informed Zimmerman that he would record in his log book that he had come over to help with the children in his capacity as D.A.R.E. officer. Id. at 31. Zimmerman and Del Santo also engaged in sexual activity in the D.A.R.E. office at the Walley School. Id. at 32, Tr. V.II at 88. On one particular occasion, Del Santo called Zimmerman at 2:00 a.m. and asked her to meet him at the D.A.R.E. office. (Tr. V.I at 32.) On her way to meet Del Santo, Zimmerman fell down her stairs, injuring herself. When she arrived at the D.A.R.E. office, Del Santo, although on-duty at the time, did not offer to render medical attention; instead, Del Santo sent Zimmerman home with the suggestion that she take some pain medication. Id. at 33; Tr. V.II at 99-100.
Thereafter, in March 2003, the Zimmerman-Del Santo relationship fizzled. On March 16, 2003, while at Zimmerman's apartment, a heated argument ensued between Del Santo and Zimmerman. (Tr. V.I at 34; Tr. V.II at 104-06.) At one point during the argument, Zimmerman screamed that she was "going to jump [off] the bridge" and stormed out of her apartment. Id. In response, Del Santo called the Bristol Police Department and informed them to be on the lookout for a woman who might be jumping off the Mt. Hope Bridge. The Bristol Police did search the bridge but did not find Zimmerman. Later that evening, the police went to Zimmerman's apartment where Zimmerman, who at that point had returned, told the police that Del Santo had forced her to have sex with him. (Tr. V.I at 35.) Zimmerman, however, later admitted that she had lied to the police when she told them she had been forced to have sex, because at the time she was angry with Del Santo.[2]Id. at 55. Sergeant Cotente then told Del Santo to go back to the Police Station. (Tr. V.II at 109.) At the station, Del Santo testified that he told Cotente that nothing was going on other than that he and Zimmerman were having an argument and that he was embarrassed to admit that he was having an affair with her.Id. at 110.
The following morning, March 17, 2003, Del Santo was called into a meeting with Lieutenant Canario and Lieutenant Ursini.Id. at 112. At the meeting, Del Santo was told not to have any contact with Zimmerman. According to Del Santo, he specifically asked if he was being ordered not to talk to her and was told that it was not an order but only a suggestion. Id. Canario, to the contrary, testified that he directly ordered Del Santo not to have any contact with Zimmerman or anyone else pertaining to the investigation. (Tr. V.I. at 94.) According to Canario, Del Santo clearly understood his instructions. Id. Despite this order, however, Zimmerman testified that Del Santo contacted her on March 17 and asked her to lie to any officers who may question her, because Del Santo was afraid he might lose his pension.[3] (Tr. V.I at 36.) Zimmerman also stated that Del Santo contacted her on March 18, 19, and 20. Furthermore, on March 19, 2003, Del Santo went to Zimmerman's son's school, removed her son from class, and told him not to talk to anyone regarding the relationship between Zimmerman and Del Santo. Id.
at 40. Del Santo contends, though, that he did not know that had he been ordered not to contact Zimmerman, and that once he realized he was under an order, he stopped all communication with her. (Tr. V.II at 120.)
On March 21, 2003, this matter intensified when Zimmerman bumped her vehicle into Del Santo's vehicle, while Del Santo was sitting in his car at a stop sign. (Tr. I. at 40-42; Tr. V.II at 126-28.) Thereafter, Del Santo drove to the Bristol Police Department, followed by Zimmerman. Id. Zimmerman was again interviewed by the internal affairs investigators and revealed that she had previously lied to them because Del Santo had asked her to do so. (Tr. V.II at 47.) She then stated that Del Santo and she had been having sexual relations for the previous nine months and that Del Santo had contacted her several times since his March 17 meeting with Canario and Ursini.
As a result of the internal investigation, on April 4, 2003, the Department formally charged Del Santo with violating the Department's Rules and Regulations for engaging in conduct unbecoming a police officer and for willfully disobeying orders, rules, and regulations. (Town's Ex. 3.) The Department recommended that Del Santo be suspended for sixty days without pay, be placed on eighteen months probation, and be removed from the D.A.R.E. position. Id. Del Santo appealed those charges and thereafter entered into a settlement agreement with the Department pursuant to which the matter was held in abeyance and the time limits in the statute of limitations were waived.
While the charges stemming from the Zimmerman relationship were still outstanding, Del Santo continued to serve as an officer for the Department. As a member of the Department, Del Santo had the opportunity to patrol the campus of Roger Williams University. On several occasions, Del Santo made contact with Kathleen Souza, a female security officer at the University. Souza testified that in September, 2004, Del Santo was called to assist in the investigation of a criminal matter involving one of the University's students. (Tr. V.I at 113-14.) According to Souza, while she and Del Santo were driving to the dormitory, Del Santo suggested that they go behind one of the campus' buildings and take pictures of one other. Id. Souza responded by telling Del Santo that he "had the wrong girl." Id. Several months later, in the fall of 2004, Souza testified that she was sexually harassed for a second time by Del Santo when he remarked that Souza probably did not like to wear seat belts because of the size of her breasts. Id. at 114-15. Souza further testified that in February 2005, while at the University's security station, Del Santo told her that if she "pulled out a boob" she could win a prize at a local bar's hot body contest, and that if she "took it all off," she could possibly make several hundred dollars. Id. at 117-18. When interviewed by Bristol Police Lieutenant Guercia in March 2005, Del Santo stated that he remembered talking to Souza about pulling out a breast for the hot body contest but did not remember the remaining comments.[4] (Tr. V. III at 48.)
In response to those comments, Souza contacted the Bristol Police Department and informed Sergeant Motta of Del Santo's behavior. (Tr. V.I at 159.) Souza thereafter submitted a report to her supervisor, Roger Williams University Security Director Brendan Doherty, who forwarded the report to the Bristol Police Department. (Tr. V.I at 144, 159.) After investigating the allegations regarding the Souza incident, Del Santo was charged with four additional counts of violating the Department's Rules and Regulations, in addition to those charges which stemmed from the Zimmerman affair. The Department requested that Del Santo be terminated. (Joint Ex. 1.)
Consequently, Del Santo made a timely request for a hearing before a Hearing Committee pursuant to the Law Enforcement Officer's Bill of Rights, § 42-28.6-1 et seq. The Committee held hearings on July 19, 21, and 22, 2005, wherein they heard testimony from several witnesses and received documentary evidence for review. On August 16, 2005, the Committee issued its decision, sustaining the charges against Del Santo and affirming the recommendation to terminate his employment from the Department. Del Santo has timely filed his appeal of that decision to this Court.
 Standard of Review
"The Law Enforcement Officer's Bill of Rights . . . is the exclusive remedy for permanently appointing law enforcement officers who are under investigation by a law enforcement agency for any reason that could lead to disciplinary action, demotion or dismissal." City of East Providence v. McLaughlin,593 A.2d 1345, 1348 (R.I. 1991). Under the Law Enforcement Officer's Bill of Rights, an officer facing departmental charges may request a hearing before a Hearing Committee composed of three active or retired law enforcement officers who have had no part in the investigation or interrogation of the law enforcement officer. §§42-28.6-1 and 42-28.6-4. The charging law enforcement agency has the burden of proving to the Hearing Committee by a fair preponderance of the evidence that the law enforcement officer is guilty of the offenses of which he or she is accused. §42-28.6-11(c). The Hearing Committee has broad discretion to modify in whole or in part the sanctions that the charging authority recommends and is not bound by the recommendations of the officer's departmental superiors. Culhane v. Denisewich,689 A.2d 1062, 1064 (R.I. 1997). If an officer is aggrieved by a decision of the Hearing Committee, the officer may appeal the decision to the Superior Court pursuant to § 42-28.6-12, which provides that the Hearing Committee "shall be deemed an administrative agency and its final decision shall be deemed a final order in a contested case within the meaning of §§42-35-15 and 42-35-15.1"
Accordingly, the Superior Court's review of a Hearing Committee decision is governed by § 42-35-15(g), which provides:
 "The Court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing agency decisions, this Court is precluded from substituting its judgment for that of the agency with respect to the credibility of witnesses or the weight of evidence concerning questions of fact. Center for Behavioral Health, R.I., Inc. v.Barros, 710 A.2d 680, 684 (R.I. 1998). This is true even in those cases where this Court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dep't of EmploymentSec., 414 A.2d 480, 482 (R.I. 1980). This Court's review is limited to determining whether substantial evidence exists to support the decision. Newport Shipyard, Inc. v. Rhode IslandComm'n for Human Rights, 484 A.2d 893, 897 (R.I. 1984)). Substantial evidence is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance."Center For Behavioral Health, R.I., Inc., 710 A.2d at 684
(quoting Newport Shipyard, Inc., 484 A.2d at 897). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). "Legally competent evidence is marked `by the presence of "some" or "any" evidence supporting the agency's findings.'" State v. R.I. State Labor RelationsBd., 694 A.2d 24, 28 (R.I. 1997) (quoting EnvironmentalScientific Corp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993)). Agency decisions on questions of law, however, are not binding upon the Court and may be reviewed to determine the law and its applicability to the facts. Narragansett Wire Co. v. Norberg,118 R.I. 596, 607, 376 A.2d 1, 6 (1977).
 The Committee Decision
A) Rules and Regulations and The Mission Statement
Del Santo first argues that the Committee's decision should be overturned pursuant to § 42-35-15(g) because the decision was based upon unlawful procedure and that if the lawful procedures had been followed, the Department could not have sustained its burden of proving that Del Santo had acted in violation of the Rules and Regulations. Namely, Del Santo argues that the Committee erred when it failed to exclude from evidence the Department's Rules and Regulations and the Department's Mission Statement. This Court finds, however, that while a complete version of the Rules and Regulations and the Mission Statement should not have been allowed into evidence, the specific Rules and Regulations for which Del Santo was provided notice of violating were properly admitted into the record as the Department complied with § 42-28.6-5, as it pertains to those rules.
The conduct of a hearing before the Hearing Committee is governed by § 42-28.6-5. As it pertains to the submission of evidence, that statute provides:
 "(c) Not less than ten (10) days prior to the hearing date, the charging law enforcement agency shall provide to the law enforcement officer: . . .
 (iii) A list of all documents and other items to be offered as evidence at the hearing. . . .
 (e) Failure by either party to comply with the provisions of subsections (c) and (d) of this section shall result in the exclusion from the record of the hearing of testimony and/or evidence not timely disclosed in accordance with those sections."
The Court is aware that the Department's Rules and Regulations "are evidentiary facts which must be proved and are not susceptible to judicial notice by a court of general jurisdiction." Hooper v. Goldstein, 104 R.I. 32, 37,241 A.2d 809, 811 (1968). See also, Town of Lincoln v. Cournoyer,95 R.I. 280, 284, 186 A.2d 728, 730 (1962) ("It is generally held that the doctrine of judicial notice will not be extended to the enactment of specific municipal ordinances or to the specific provisions of such municipal ordinances"). While not a court of general jurisdiction, the Hearing Committee does not stand in a peculiar relationship with the Bristol Police Department, the entity which promulgated the Rules and Regulations, so that judicial notice of the Rules and Regulations would be proper.See Hooper, 104 R.I. at 37, 241 A.2d at 812.[5]
Accordingly, the Committee was prohibited from taking judicial notice of the Rules and Regulations and the Mission Statement, and the Department was required to prove those documents as evidentiary facts. Thus, the Department was required to submit the Rules and Regulations and Mission Statement into the record as evidence pursuant to the procedural guidelines set forth in the Law Enforcement Officer's Bill of Rights, § 42-28.6-1 et seq.
Del Santo contends that neither he nor his counsel ever received a list of the documents that the Department intended to introduce at the hearing; instead, they were only provided with two packages of documentation, with neither package containing the Rules and Regulations or the Mission Statement. Accordingly, Del Santo claims, pursuant to § 42-28.6-5(e), the Rules and Regulations and the Mission Statement should have been kept out of the record, and consequently, by failing to exclude those document, the Committee's decision is based upon reversible procedural error. Furthermore, Del Santo argues that because the Rules and Regulations should have been excluded from evidence, it follows that the Department failed to satisfy its burden of demonstrating that Del Santo violated the Rules and Regulations as those Rules and Regulations had not been proven to exist in the form that was submitted to the Committee.[6] However, this Court finds that the Rules and Regulations that the Committee found Del Santo to have violated were appropriately admitted into evidence.
Here, it is uncontested that the Department never provided Del Santo with a list indicating their intention to submit to the Committee a complete copy of the Rules and Regulations or the Mission Statement. Therefore, it was erroneous for the Committee to accept such documents as evidence when § 42-28.6-5(e) specifically provides that evidence shall be excluded when a party has failed to provide the appropriate notice of his or her intent to introduce that evidence at the hearing. However, while the complete copy of the Rules and Regulations should have been excluded from the record, those Rules and Regulations which Del Santo was specifically charged with violating were properly before the hearing Committee. On April 14, 2005, more than ten days prior to the hearing date (the limitation period provided in § 42-28.6-5(c)), the Department provided Del Santo with a list of the charges against him and a list of the specific Rules and Regulations he was charged with violating. (Joint Ex. 1.) That letter set forth the charges as follows:
 "It is my duty to inform you that you are being charged with the following violations of the Bristol Police Department Rules and Regulations:
 1. CHARGE: 1-2 IV. B. CONDUCT UNBECOMING A POLICE OFFICER
 SPECIFICATION: In that on or about the month of June 2002 and until the month of March, 2003 while in the capacity of the Bristol Police Drug Awareness Resistance Education Officer (D.A.R.E.) engaged in a sexual relationship with Lisa Zimmerman. That this relationship was entered into with the parent of a D.A.R.E. graduate, and another child currently engaged in the D.A.R.E. program under your direction.
 2. CHARGE: 1-2 VI. B. OBEDIENCE TO ORDERS, RULES AND REGULATIONS.
 SPECIFICATION: In that you violated department Rules entitled, (authority) which states that all department employees shall obey all lawful orders issued to them. In that on March 17, 2003 you failed to follow an order by Lieutenant Josue D. Canario, a member and officer of the Bristol Police Department, not to have contact with Lisa Zimmerman while an investigation into allegations against you were being conducted.
 3. CHARGE: 1-2 GENERAL RULES OF CONDUCT, 1V, B. CONDUCT UNBECOMING, 1-2-3
 SPECIFICATION: In that during the time period of September 2004 through February 2005, you did have a conversation with Kathleen Souza regarding seat belts and the conversation involved inappropriate comments regarding women's breast [sic]. Further, in September 2004, you engaged in conversation with Kathleen Souza while she was in a police vehicle and you requested that she drive with you behind a building and engage in taking photographs of one another. And further that on another occasion during a conversation in early February while in the Roger Williams University Security Office, you made inappropriate comments to Kathleen Souza regarding her breast. This action by you reflects unfavorably on your ability to perform in a professional manner which brings discredit to both yourself and the department.
 4. CHARGE: V. GENERAL APPEARANCE AND BEHAVIOR, H.1., APPROPRIATE CONDUCT 1-2-8
 SPECIFICATION: In that during the time period of September 2004 through February 2005, you had a conversation with Kathleen Souza regarding seat belts, and that conversation involved inappropriate comments regarding women's breast [sic]. Further, in September 2004, you engaged in conversation with Kathleen Souza while she was in a police vehicle and you requested that she drive with you behind a building and engage in taking photographs of one another. On another occasion during a conversation in early February while in the Roger Williams University Security Office, you made inappropriate comments to Kathleen Souza regarding her breast. Your actions in making inappropriate comments rise to the level of inappropriate conduct, sexual harassment, and the use of inappropriate sexual related language causing public disgust and alarm.
 5. CHARGE: B. OBEDIENCE TO ORDERS, RULES AND REGULATION G. FALSE STATEMENT. 1-2-13
 SPECIFICATION: Whereas you withheld information as to the truth of the alleged incidents involving Kathleen Souza that assisted in resolving the complaint currently under investigation.
 6. CHARGE: A. VIOLATION OF RULES, J. NEGLECT OF DUTY. 1-2-4
 SPECIFICATION: Between September 2004 and February 2004 you engaged in computer entertainment while in the security office at Roger Williams University, while on duty and not related to the course of your duties." (Joint Ex.1.)
Clearly Del Santo was provided with a list of the Rules and Regulations that were to be used against him, as the charges list the specific Rules and Regulations Del Santo was accused of violating: Rule IV. B, Rule VI. B, Rule V.H. 1, Rule VI. G (1-2-13), and Rule IV. J (1-2-4). While the charges did not include the exact language of those Rules and Regulations, the Department did not have the duty to disclose the contents of the Rules. General Law § 42-28.6-5 only requires that the charging law enforcement agency provide the law enforcement officer with "[a] list of . . . items to be offered as evidence at the hearing." (Emphasis added.) The Department, therefore, satisfied the statute by providing Del Santo with a list of the Rules and Regulations that he was being charged with violating. Further, even if the Department were required to disclose the contents of the Rules and Regulations, such a requirement would have been satisfied as Del Santo testified that he indeed received a copy of the Rules and Regulations at some point while serving as an officer. At the July 22, 2005 hearing, the following exchange took place:
 "SGT. DaSILVA: One last thing, Bill [Del Santo]. You got a copy of the general rules of conduct?
 THE WITNESS [DEL SANTO]: Yes.
 SGT. DaSILVA: You're familiar with it?
 THE WITNESS: Yes. . . .
 SGT. CAMROLA: Back to the rules of conduct. When were you given a copy of the rules of conduct?
 A. I was given my initial copy when I got hired way back I believe.
 Q. This one has an effective date of 1997. You were hired probably about `86?
 A. `88.
 Q. Were you given another copy of this one that was reintroduced?
 A. We get updated copies of the rules and regs all the time, and we're told to put them into the book that we have.
 Q. So you received a copy of this one?
 A. I'm sure I did." (Tr. V. III at 49-50.)"
Del Santo was thus aware of the Rules and Regulations that were going to be used against him as he had previously been given a copy of such documents. Apparently, though, Del Santo would have this Court hold that because the Department did not provide him with a sheet of paper with words to the effect of "This is a list of the Rules and Regulations which will be submitted as evidence to the Hearing Committee," those Rules should not have been introduced into the record.[7] However, this Court does not interpret the language of § 42-28.6-5 (c)(iii) so narrowly and instead interprets the language so as to afford to it its plain and ordinary meaning. Kells v. Town of Lincoln, 874 A.2d 204,213 (R.I. 2005) ("When the language of a statute . . . is clear and unambiguous, we interpret the statute literally and give the words their plain and ordinary meaning.") In doing so, this Court finds that the Department satisfied the statute as it provided Del Santo with a list of the Rules and Regulations that he was charged with violating. Clearly, these Rules were to be submitted as evidence. Thus, the Committee did not err by allowing those portions of the Rules and Regulations into the record. The remaining Rules and Regulations, as well as the Mission Statement, which were erroneously admitted into evidence, did not prejudice Del Santo's substantial rights, as the Committee's decision is limited to finding Del Santo violated the Rules and Regulations which were appropriately before the Committee. Accordingly, this Court denies Del Santo's request to reverse the Committee's decision on this ground.
B) The Penalty
Del Santo further contends that it was an abuse of discretion for the Committee to sustain the Department's recommendation to terminate his employment rather than to impose a less severe penalty. According to Del Santo, the alleged misconduct involving Souza consisted of nothing more than three occasions of inappropriate comments, for which his immediate supervisor, Sergeant James Motta, recommended that Del Santo be given a verbal warning. (Town's Ex. 4 at 19.) In addition, Del Santo notes that while the Department recommended that Del Santo be suspended for sixty days following the Zimmerman incident, the matter was never fully prosecuted, and Del Santo did not serve any suspension time for the matter. Del Santo, therefore, argues that as a seventeen and one-half year veteran of the Department with no record of any significant discipline,[8] the Committee abused its discretion by terminating him from employment. Del Santo argues that there is no substantial evidence in the record to support any suggestion that Del Santo engaged in a pattern of misconduct, and thus, the Committee's decision should be reversed.
"The hearing committee is not bound by the recommendations of the officer's departmental superiors. The committee has great discretion to modify in whole or in part the recommended sanctions presented by the charging authority." Culhane v.Denisewich, 689 A.2d 1062, 1064-65 (R.I. 1997) (citing StateDep't of Environmental Mgmt. v. Dutra, 121 R.I. 614,401 A.2d 1288 (1979); Lynch v. King, 120 R.I. 868, 391 A.2d 117 (1978) (committee may amend or modify the recommendation of the charging authority in respect to discipline or other punishment)). This Court recognizes, though, that an agency's, or in this case Hearing Committee's, sanction determination involves not only an ascertainment of the factual circumstances, but also the application of administrative judgment and discretion. Kulkin v.Bergland, 626 F.2d 181 (1st Cir. 1980). The prevailing view has thus been that review of the sanction imposed is an arbitrary and capricious review, which requires that the penalty be upheld unless unwarranted in law or without justification in fact.Broad Street Market, Inc. v. U.S., 720 F.2d 217 (1st Cir. 1983); Colazzo v. U.S., 668 F.2d 60 (1st Cir. 1983); Objio v.U.S., 113 F. Supp. 2d 204 (D. Mass. 2000). Accordingly, the Supreme Court of Rhode Island has held that this Court cannot substitute its judgment on findings of fact for that of the Committee and cannot modify the sanction imposed by the Committee so long as substantial evidence supports the decision. Culhane,689 A.2d at 1064-65 (R.I. 1997); see also, Rocha v. PublicUtilities Comm'n, 694 A.2d 722, 726 (R.I. 1997) (holding that the trial court may not substitute its judgment for that of the board with respect to the imposition of a sanction when competent evidence supports the factual findings of the board).
The Department requested that Del Santo be terminated because his improper behavior had continually progressed, and that while he had been spoken to about his behavior, he continued to act inappropriately. (Tr. V.I at 19.) According to Chief Serpa, Del Santo had engaged in a "pattern of behavior that is unacceptable under law enforcement standards." Id. at 17-18. Chief Serpa actually testified that he feared "that some day he's [Del Santo] going to go out and do something that's really going to be crazy." Id. at 19. The Committee addressed these concerns and specifically recognized the severity of both the charges brought against Del Santo and the penalty imposed.[9] In deciding to terminate Del Santo from employment with the Department, the Committee found the following:
 "The public's trust in its' [sic] law enforcement officers is not something to be taken lightly, and Ptlm. Del Santo has violated that trust. As police officers, we are held to a higher standard, and it can be argued that a DARE officer entrusted with the teaching of children, he must be held to a higher one still. However, his unethical, immoral and offensive behavior has tarnished the reputation of the Bristol Police Department. Citizens contacting police for assistance must not be left to concern themselves with whom the responding officer is, or what his actions will be." (Decision at 4.)
This Court finds that the Committee's decision to terminate is amply supported by the reliable, probative, and substantial evidence in the record and by the Committee's findings of fact. As will be discussed in greater detail below, substantial evidence supports the Committee's decision to sustain the six charges brought against Del Santo, indicating that Del Santo embarked upon a pattern of behavior that was inappropriate for a law enforcement officer.
i. Charge 1: Conduct Unbecoming a Police Officer
Del Santo was first charged with violating Rule IV. B. for engaging in conduct unbecoming a police officer for maintaining a sexual relationship, while as a D.A.R.E. Officer, with the parent of children in the D.A.R.E. Program. The Committee sustained this charge, finding that Del Santo partook in conduct unbecoming an officer by having a sexual relationship with Zimmerman and by engaging in oral sex/intercourse while both on and off-duty. The Court finds the decision is supported by substantial evidence.
Zimmerman testified to the Committee in great detail about her nine month relationship with Del Santo. She explained to the Committee how she met Del Santo through her son, who was a student in his D.A.R.E. program. (Tr. V.I. at 28, 46.) She described how she and Del Santo would often engage in sexual activity while Del Santo was on-duty and how he would report to the Department that he had been helping her with her children.Id. at 30-31. She went on to testify that on certain occasions, she and Del Santo would meet to have sex in the Walley School, and that one evening she arrived there injured, and although on duty at the time, Del Santo did not offer to provide her with medical attention. Id. at 32-34. Zimmerman also testified that as the relationship was on the verge of becoming public, Del Santo asked her to lie to investigating officers to conceal their relationship. Id. at 36.
In contrast to Zimmerman's account of the relationship, Del Santo testified that he felt as if he were being stalked and was the victim of Zimmerman's harassment. (Tr. V.II at 93.) However, when the testimony of two witnesses appears to be inconsistent, the Committee is allowed to engage in credibility determination. When the Committee makes a finding of fact based on credibility, this Court on review has no authority to reassess the witnesses' credibility on a cold record. See Environmental ScientificCorp. v. Durfee, 621 A.2d 200, 206 (R.I. 1993) ("observations of live testimony necessarily enter into a determination of what the trial judge believes and disbelieves. . . . Before disturbing findings based on credibility determinations, the appellate division must first find that the trial judge was clearly wrong") (internal citations omitted)). Here, the Committee did not find Del Santo's description of the relationship to be credible and found that "[t]estimony by Mr. Del Santo that he was the `victim' of Zimmerman's `stalking' rang hollow, as he made no attempts to `protect himself'[10] within the system he had worked in as an officer for over fifteen years, and repeatedly contacted her throughout." (Decision at 2.)
The record demonstrates that the Committee's credibility determinations were not clearly wrong. Del Santo admitted that he had engaged in sexual relations with Zimmerman while a D.A.R.E. officer, yet at certain times he told others that there was no relationship between the two. Compare Tr. V.II at 87-89 (admitting that he had oral sex with Zimmerman on at least four occasions) with Tr. V.II at 110 (testifying that when questioned by Sergeant Cotente about the relationship, he responded that nothing was going on); see also, Tr. V. III at 41 (admitting he had lied when he stated that he and Zimmerman never had sex). As the Committee held, "[Del Santo's] repeated inconsistencies and lapses of memory throughout the investigation(s), and subsequent testimony called [his] credibility into question." (Decision at 4.) Similarly, even if Del Santo was found to be credible, he testified that on occasions he had sexual relations with Zimmerman, who had a child in the D.A.R.E. program. (Tr. V.II at 87-88.) Importantly, when asked if he believed he was acting or conducting himself in a manner unbecoming an officer when he engaged in sexual relations with Zimmerman, Del Santo responded "Yes." Id. at 151.[11] It therefore follows that substantial evidence supports the Committee's decision that Del Santo committed conduct unbecoming of an officer.
ii. Charge 2: Obedience to Orders, Rules and Regulations
The Committee next found that Del Santo knowingly and willfully failed to obey the order given to him by Lt. Josue D. Canario on March 17, 2003, prohibiting Del Santo from having contact with Zimmerman as to the investigation that was being conducted. It is undisputed that Del Santo contacted both Zimmerman and her son subsequent to his March 17 meeting with Canario.[12] Del Santo contends however, that Canario's March 17 directive was not an order but only a suggestion. However, this Court finds that there was substantial evidence in the record for the Committee to find that Del Santo understood that he was being ordered to refrain from contacting Zimmerman on March 17, and that he willfully disobeyed this order.
At the July 19, 2005 hearing, Canario testified that he "ordered" Del Santo not to have any contact with Zimmerman or anyone else pertaining to the investigation. (Tr. V.I at 94.) When asked if he believed whether Del Santo understood the order, Canario responded: "Absolutely. He's a 16-year veteran, 15-year veteran of the police department; he understood it very clearly."Id. The Committee found Canario to be credible and Del Santo to be "not credible" and stated the following:
 "Ptlm. Del Santo's testimony that he did not understand the order given to not have contact with involved parties to be a `direct order' was found to be `not credible.' As a senior officer in the department, and given the seriousness of not only Zimmerman's — but his claims as to the fact of the matter, a reasonable person would conclude that he was aware of his obligations." (Decision at 2.)
Accordingly, Canario's testimony that Del Santo understood the order and the uncontroverted fact that Del Santo did indeed contact Zimmerman subsequent to Canario's order serves as substantial evidence to support the Committee's finding that Del Santo willfully and knowingly violated a direct order.
iii. Charge 3: Conduct Unbecoming an Officer/Charge 4:Appearance and Behavior
This Court further holds that there is substantial evidence in the record to uphold the Committee's decision that Del Santo violated the Department's Rules and Regulations by engaging in conduct unbecoming an officer[13] and for behaving inappropriately while in public.[14] Souza testified that on at least three occasions, Del Santo made inappropriate sexual remarks to her, and some of these remarks occurred in the presence of others. Souza maintained that in September 2004, Del Santo asked her to go behind one of the campus' buildings so they could take pictures of each other and later commented to her that she did not like to wear seatbelts because of the size of her breasts. (Tr. V.I at 113-15.) Souza further testified that in February 2005, while at the University's guard station, Del Santo told her that if she "pulled out a boob," she could win a prize at a local bar's hot body contest, and that if she "took it all off" she could possibly make several hundred dollars. Id. at 117-18. This last comment was made in the presence of others, including Officer Dunning, who was not comfortable with Del Santo's presence and asked him to go elsewhere. Id. at 118-19.
Del Santo admitted telling Souza that if she pulled out her breast she could win the hot body contest, and that there were other people present in the Security Office at the time this comment was made. (Tr. V.II at 147.) As to the remaining comments of which Del Santo was accused, Del Santo simply testified that he could not recall making them, but at the same time, he stated that he did not want his testimony to imply that he was calling Souza a liar. Id. at 149; Tr. V. III. at 48. Consequently, the Committee concluded that these memory lapses weakened Del Santo's credibility and found that Del Santo, while on duty, acted unprofessionally and engaged in conduct unbecoming a police officer for his inappropriate and harassing comments to Souza. Souza's testimony, therefore, is reliable credible evidence which support's the Committee's findings.
iv. Charge 5: Obedience to Orders, Rules and Regulations/FalseStatements
The Department further charged Del Santo with violating the Rules and Regulations by withholding information as to the truth of the alleged incidents involving Kathleen Souza, which could have assisted in resolving the complaint that was under investigation. This finding is supported by substantial evidence. First, the Court heard, and found credible, Souza's testimony that Del Santo made numerous sexually harassing comments to her. The Court then heard testimony from Lieutenant Nick Guercia. Guercia testified that when he investigated Del Santo and questioned him on his comments, Del Santo admitted to telling Souza she could win the hot body contest if she showed her breast, but could not recall making the other comments. (Tr. V. II at 57-58.) Geurcia then concluded that Del Santo "was not being truthful." Once again, the Committee was permitted to make credibility determinations and held that Del Santo's testimony, in which he stated that he simply could not recall his conversations with Souza, lacked credibility. (Decision at 3.) ("[Del Santo] regularly stated that he could not recall the context of comments, or conversations, and made repeatedly inconsistent statements to Lt. Geurcia in his report, showing a lack of credibility, and raising doubts as to his truthfulness.") Accordingly, finding the testimony of Souza and Geurcia credible, the Committee had before it substantial evidence that Del Santo provided the Department with false statements, impeding their investigation into the matter, thereby acting in violation of the Rules and Regulations.
v. Charge 6: Neglect of Duty
Del Santo was found to have violated Rule IV. J. for neglecting his duties as an officer by engaging in entertainment while on duty, which was not required in the performance of his duties. In particular, the Committee found that Del Santo engaged in computer entertainment at the Roger Williams University Security Office. As Del Santo never denied this charge, the parties stipulated that Del Santo did indeed engage in computer entertainment while on duty.
As substantial evidence supports the Committee's decision to sustain all of the charges brought against Del Santo, the Committee could reasonably conclude that Del Santo engaged in a pattern of behavior warranting his termination from employment. This pattern of outrageous behavior was clearly demonstrated by the Committee's findings. The Committee found that Del Santo had engaged in oral sex/intercourse on several occasions while both on and off duty. (Decision at 2.) The Committee further found that on one occasion, Zimmerman met with Del Santo while he was on duty, and although Zimmerman was injured at the time, Del Santo did not offer medical attention for fear the relationship may have been exposed. Id. Additionally, the Committee found that Del Santo deliberately disobeyed orders and gave false statements to his supervisors. Id. at 2-3. These findings, amongst others, which were supported by substantial evidence in the record as discussed above, demonstrate a rational relation between the findings of misconduct and the sanction imposed. Del Santo's behavior, as Chief Serpa testified, was progressively becoming worse as his inappropriate sexual comments continued even after he was cautioned about his behavior following the Zimmerman incident. By failing to follow orders, engaging in sexual activity while on duty, making inappropriate comments, and failing to provide medical attention to an injured person while on duty, the Committee found that Del Santo tarnished the reputation of the Department. Accordingly, the Committee did not abuse its discretion when it determined that the appropriate penalty in this matter was termination from employment.
 Conclusion
While a complete version of the Rules and Regulations and the Mission Statement should not have been admitted into evidence, the Rules and Regulations which Del Santo was found to have violated were appropriately in the record. Accordingly, any procedural error committed by the Committee did not violate Del Santo's substantial rights. Further, the Court finds that substantial evidence in the record supports the Committee's decision to sustain the six charges, and the Committee did not abuse its discretion by holding that Del Santo should be terminated for his offenses. Accordingly, the Committee's decision is affirmed. Counsel shall prepare an appropriate order for entry, consistent with this Decision.
[1] Zimmerman testified that at D.A.R.E. Day, she had been sitting with her children when she expressed her desire for a cigarette. Del Santo then asked her children to move because he had something dirty to tell their mother. Del Santo then whispered something to the effect that a good time to have a cigarette is after good sex. When Zimmerman replied that she had not had sex since her husband had left her, Del Santo stated, "Well, I could always take you downstairs." (Tr. V.I at 53.)
[2] Zimmerman testified, though, that she corrected the statement right after saying it and told the police that the sex had been consensual. Id. at 56.
[3] Zimmerman apparently heeded this advice, for when she was interviewed by the Bristol Police Department on March 18, 2003, Zimmerman told the officers that nothing had happened between her and Del Santo, and that she had simply forgotten to take her medication. (Tr. V.I at 67.)
[4] Del Santo later testified that of the above incidents, he only recalled making the comment regarding "pulling out a boob" and did not remember any of the other statements. Del Santo did not actually claim that he did not make the comments Souza alleged, only that he could not remember them. He testified: "I never said Kathleen Souza was lying. I don't remember the conversations she's alluding to. . . . I don't remember that conversation taking place. I'm not calling her a liar." (Tr. V. III at 48.)
[5] In Hooper, the hearing tribunal was allowed to take notice of the police department's regulations because the Court found that a municipal tribunal may recognize the regulations of the municipality which created it. There, the municipality that promulgated the police rules also created the hearing tribunal. Here, however, such a relationship does not exist between the Hearing Committee and the Town of Bristol, because the Town of Bristol did not create the Law Enforcement Officer's Hearing Committee.
[6] Rhode Island General Law 1956 § 42-28.6-11(c) places the burden of proof upon the charging law enforcement agency and requires the following:
 "In any proceeding under this chapter, it shall be the burden of the charging law enforcement agency to prove, by a fair preponderance of the evidence, that the law enforcement officer is guilty of the offense(s) or violation(s) of which he or she is accused."
[7] It is true that the Department did know how to use more explicit language. When providing Del Santo with a list of its potential witnesses, the Department issued forth a letter with language stating: "Pursuant to the Law Enforcement Officers' Bill of Rights SECTION 42-28.6-1 the Bristol Police Department is providing a list of potential witnesses that may testify at your hearing scheduled for June 20, 2003. The names are as follows:. . . ." (Town's Ex. 3.) While such language is indeed useful and clearly demonstrates compliance with § 42-26.8-5, such exact language is not required so long as a list of the evidence is provided and it is clear that such evidence will be used at the hearing.
[8] Del Santo did testify, though, that early in his career, he was investigated for a possible child abuse case, but the charge was unfounded. Additionally, in or around 1996 or 1997, Del Santo was suspended for two days for using Department letterhead without permission. (Tr. V.II at 77-79.)
[9] The Committee stated: "The enormous responsibility of this commission was not taken lightly by any member of the panel." (Decision at 1.)
[10] Del Santo stated that he was afraid of Zimmerman and the potential consequences from the relationship, yet he never requested a restraining order and he continued to go to her apartment alone. (Tr. V.III at 38-39.)
[11] Furthermore, during his closing argument, counsel for Del Santo even stated at the July 22, 2005 hearing that "[t]he employer has sustained its burden of the charge, naturally conduct unbecoming in that he engaged in a sexual relationship." (Tr. V. III at 68.)
[12] Del Santo testified that he called Zimmerman on March 17 and 18, 2003, and on March 19, 2003, he visited with and spoke to Zimmerman's son at the son's school. (Tr. V. II at 114-17, 119-20.)
[13] Rule IV. B. provides: "Conduct Unbecoming: Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect favorably on the department. `Conduct unbecoming an officer' shall include that which brings the department into disrepute or reflects discredit upon the officer as a member of the department, or that which impairs his or her ability to perform as a law enforcement officer."
[14] Pursuant to Rule V.H.1 governing the public appearance of the Department's officers, "[w]henever on duty or in uniform, each employee shall maintain a professional demeanor, conduct and appearance. They shall avoid inappropriate conduct, including but not limited to horseplay, deliberately erratic vehicle operation for no legitimatepurpose, sexual harassment, use of profanityor vulgarlanguage, insubordination, or other behavior that would cause public disgust or alarm."